Mr. Thomas? Yes, Your Honor. When you're ready. I am, Your Honor. Your Honor, I reserve five minutes for rebuttal time. Dirk Thomas, Your Honor. On behalf of Medtronic, Sophomore Danik, the appellant in this case. Your Honor, this appeal relates to a particular technology as described in the patent that are spinal screws. The spinal screws have a shaft, a threaded shaft that the patent calls an anchor. A surgeon places that spinal screw in a patient's vertebra, lines up a number of the screws along the length of the vertebra, and then attaches a rod to what's called an anchor seat in the claims. And the anchor seat is threaded so that a securing means, as the claim requires, which is a threaded securing means, is then threaded onto the anchor seat to press the rod down into the anchor seat. This case, Your Honor, is decided on the doctrine of claim vitiation. Claim five is a very simple claim with respect to the one limitation that's still in issue. And that is the limitation that requires threads on the anchor seat that extend to a depth below the diameter of the rod when the rod is in the rod receiving channel. It's a very clear, very simple structural limitation that was added during prosecution by the patent applicant to distinguish over prior art and overcome Section 112 rejections. Now, Your Honor, the accused device has threads that terminate before the top of the diameter of the rod. In other words, in the accused device, the threads on the anchor seat stop above the rod. The claim expressly requires that the threads extend to a point below the diameter of the rod. Above doesn't equal below, and below doesn't equal above. Mr. Thomas, before we get to the merit, the discussion of the ins and outs of claim five, what is the status of, I mean, we sent, the earlier case sent claim five back to the court on validity. Is there anything going on, has the district court done anything with regard to that remand yet? Yes, Your Honor, and obviously I've been thinking about that. This court's decision, what we're calling cross one, sent back to the district court the issue of not only validity, but also infringement of claim five, but never addressed this particular limitation in the claim with respect to the thread depth, as I'll call it, because what had happened, Your Honor, is the original design of the product that was accused of infringement had threads that went all the way down in the anchor seat, below the diameter of the rod. The first appeal in cross one was an appeal under 1295C of an injunction against further sales of that original design. So Medtronic modified the design of the screw to terminate the threads above the rod. That issue was not right at the time of the first appeal. So now where we are, Your Honor, we had a status conference with a new judge that's been assigned to the case, Judge Taylor, retired, Judge Pragerson. We're in the process of conducting some additional discovery with respect to some changes in claim interpretations that this court issued in its cross one decision. There's been no further action by the court on the question of validity of claim five? No, Your Honor, there won't be. And the status of this injunction in this case is still in effect? Well, Your Honor, we believe that the injunction in this case needs to be vacated for the very same reasons that the injunction was vacated in the first case, and here's why. Even leaving aside the claim five issue that you just argued? It was the same. Claim five was a claimant issue in the first appeal as well. No, but the claim five, the particular claim five, you're suggesting that we could vacate the second injunction without even getting to the red-depth limitation? Well, Your Honor, maybe suggesting is the wrong term because we would like you to address that term. But the fact of the matter is all of the same non-infringement arguments that were advanced in cross one, all of the same invalidity arguments that were advanced in cross one apply to the redesign screw. The only change we made was to terminate the threads. So we could go back to various limitations in the claim about operatively joined and anchor seats. So you're saying that even if we were to agree, assume at the moment we were to agree with the district court on the thread-depth limitation and the vitiation issue and the festo presumption issue, we would still have to vacate the second injunction because of what was done in cross one? Not only would you have to vacate the second injunction, you'd have to reverse the summary judgment ruling because the summary judgment ruling here adopted all of the same infringement and invalidity rulings that the district court had pronounced in cross one, which this court has now vacated and sent back. But we do have the vitiation in front of us here? We do, Your Honor. Let's talk about it for a second. Yes. Isn't there a logical inconsistency in the vitiation doctrine? How so, Your Honor? We'll think about it in a minute. You vitiate because there's a missing literal claim limitation. Of course, that's the definition of the doctrine of equivalence. By definition, you have a missing limitation. How do you know if when a limitation is missing, the doctrine of equivalence should apply because it's an equivalent or it shouldn't apply because it's vitiating a literal claim limitation? I think the distinction to address there, Your Honor, is what's been substituted in place of the missing claim limitation. Anything in our law which gives you any basis for making a neutral determination between application of the vitiation exception to the doctrine of equivalence and the doctrine itself? Anything in this court's case? In our court's jurisprudence which clarifies what the standard is for applying the doctrine of equivalence to rectify the missing limitation or to refuse to apply the doctrine of equivalence because there is a missing limitation? Your Honor. The answer's no. The answer's no. Yes, I know the answer's no. The answer was absolutely no. So how do we deal with that? So how do we deal with that? Well, you look for a substitute. I mean, the interesting thing is the Supreme Court gave us the vitiation doctrine just when all the rest of us had concluded that it is logically inconsistent and can't be applied. So what do we do with it? Well, you do what I think this court has said you do. You look to see if there has been something else substituted for the missing element in the claim that's not exactly the same as the claim requires, not literally what the claim requires, but is there something else there that's doing that function? And if there is, Your Honor, you can try to balance. Well, you can give examples. If there are not threads, for example, Your Honor, maybe there are ratchets. All right? One could reasonably then sit there and say, OK, well, we've substituted a ratchet where there was a thread required. Well, maybe, maybe there's some room for the doctrine of equivalence to apply there. But, Your Honor, when you've got nothing that's been added to— Why not stick with what the Supreme Court did give us in Festo, which is a foreseeability test, and we can look to see if it would have been foreseeable to have so stated your claim limitation so as to have avoided the necessity of the doctrine of equivalence in the first place? Your Honor, we would encourage you to embrace the foreseeability test as the determining factor here. And here's why. If somebody says threads stop at a certain point, they get to pick wherever that point is. It's certainly foreseeable that they could have said threads stop above, threads stop below, threads stop right at the rod. It's hard to conceive how an applicant writing this claim for his attorney couldn't have foreseen, because also, Your Honor, recognize when the claim was originally presented, there were no limitations on where the threads started or stopped. Then they went about picking a point that they said, OK, the threads have to go at least to here. Well, they could have said it here, here, or there. So from a foreseeability test, Your Honor, certainly we believe that that is a good way to certainly view the facts in this case. So just back to the details of what you were talking about. Here, the other side is referencing something called an effective thread. Right. And so in your view, arguably, if there were indeed an effective thread in the accused's device, that might be covered and wouldn't necessarily come under the vitiation. But your position is that here, there is no effective thread? Well, that was the district court's position as well, Your Honor. And recognizing the accepted definition of an effective thread is one where there are crests that are not fully formed, but where there is a root joining adjacent crests. So think about the zigzag. You know, the threads get a little smaller. In the accused's device, it's a flat line. There is no partially formed thread in what's called the undercut. So from that standpoint, Your Honor, we don't believe that the effective thread argument has any merit at all. I mean, when is a thread not a thread? Well, there's no thread there. And if you look at the accused's device, it's just a gap. It's an undercut. There's no partially formed peaks, valleys, roots, nothing. That's like saying open space is an effective thread. You know, where a screw goes through a nut, well, on the other side of the nut, every place where there's a thread, there must be an effective thread. It just doesn't make any sense. And I believe the district court handled that one properly. I would like to make one point, though, with respect to, I think, how the district court missed what I'm telling you is such a clear instance of plain vitiation. What the district court did is say, well, I'm not vitiating the thread depth limitation because I'm saying there are two things in the accused's device, a thread and an undercut, that meet the requirement of there being a thread that extends below the depth of the rod. Well, that's wrong. And here's why that's wrong. You can't have something that—the thread depth limitation— It's performing substantially the same result, same function, and getting it in substantially the same way. Why isn't he right? He's not right, Your Honor, because the claim requires that the threads extend below the diameter of the rod. But you're getting the same results, performing the same function in the same way. Why isn't he right in applying the doctrine of equivalence? I'll tell you why he's not right in applying the doctrine of equivalence, Your Honor, because then how does my client know where the boundaries of that claim start and stop? The claim says very specifically, this is where the claim— That's always the problem with the doctrine of equivalence. I mean, you're arguing for abolishing the doctrine of equivalence. The Supreme Court said we're not going to do that. There's always some level of uncertainty. There is, Your Honor, but when there is a simple, straightforward, structural limitation— Again, the doctrine of equivalence, Your Honor, is not a do-over statute. Okay, you're arguing foreseeability. I like that argument. The foreseeability is certainly there. But when you start arguing we want to do away with the doctrine of equivalence— No, I'm not, Your Honor. What I'm arguing here is, just as you said, foreseeability. The doctrine of equivalence and a do-over statute, they got to pick what words they wanted to use. We're not saying they couldn't have claimed it more broadly. We're not saying that. Maybe they could. They don't get to come back here and do it again. And if Your Honor is there, I'd like to reserve the rest of my time. You're welcome to do so, Mr. Thomas. Mr. Finkelstein? Good morning. May it please the Court, Mark Finkelstein of Lakeland Watkinsburg Cross Medical. Before I get to the merits, I do want to touch on a jurisdictional issue that Mr. Thomas discussed and I think was raised by this panel in terms of why are we here. As Mr. Thomas said, this is the second time we've been up here. In the first appeal called Cross I, Medtronic appealed a first permanent injunction. The case was ongoing. It was just on the permanent injunction. This court sent it back. While that was ongoing, Medtronic did a design around. We filed for a summary judgment on that. We got a second permanent injunction. So they were proceeding on parallel tracks. This court, of course, made its decision in Cross I, finding questions of fact on infringement as well as a question of fact on obviousness. Remaining to district court. At that time, and I agree with Mr. Thomas It doesn't leave us much, does it, to do? Well, in fact, Your Honor, I would say that I agree with Mr. Thomas. This second permanent injunction, if you look at Cross I, Medtronic wouldn't be able to stand because of the factual issues on Claim 5. So the question is, why are we here? Why are we here at all if the second permanent injunction doesn't stand? Now, Medtronic would like to have its cake and eat it too. What they're saying is, if they win, great. The design around was successful, and they avoid a permanent injunction. But if they lose, and this court agrees with us that Judge Taylor was correct on the design around, they say they still win. Because at that point, they would go back to the district court and say, well, but there were these other issues that were decided in Cross I, so the second permanent injunction should still be vacated. Well, that's going to happen anyway, isn't it? Well, but this is a situation where Medtronic's seeking a purely advisory opinion. Because they're saying either way. The only reason we're here, this isn't the final judgment, the only reason we're here is on the second permanent injunction. And they're saying either way, win or lose, no matter what you rule, that second permanent injunction has to go away. So they're seeking an advisory opinion. Let me suggest one reason why there could be jurisdiction here. I think the only way to conclude there's jurisdiction would be to find that Medtronic has waived its right to argue that because of what happened in Cross I, the second permanent injunction should be dissolved. Because this ruling should have Medt or else it would be purely advisory. Wait, so your suggestion is even if the court were to find that the claim is invalid as obvious, Claim 5 on remand, this injunction on DOE of Claim 5 should still go forward? If we're going to have a ruling or else this court should say it's a purely advisory opinion. Because otherwise, it is just advisory. Because win or lose, the injunction goes away, which is the only reason we're here. There's been no trial. As a matter of fact, we have this injunction before us. It's not been vacated. What has happened is that there are some matters which call into question some of the application of this injunction. But it's before us, and we have jurisdiction. So why don't you proceed ahead and deal with whatever issues are presented by it. Thank you, Your Honor. And might remain in light of what's already happened. I will, Your Honor. So as you heard, Medtronic's main argument is vitiation. And Your Honor suggests that foreseeability could be a key element. And I suggest that in the Friedman-Seeding case, they said if it's not foreseeable, it probably isn't vitiated. But the Friedman-Seeding decision said that is the equivalent an insubstantial change that doesn't render the claim meaningless? That was what they used for vitiation. So was this change insubstantial? Which is, again, a restatement of the doctrine of equivalence. I think it's very close. Very close. If not, I don't know. There's no real distinction to be made there. What would you have us do? I think that's the task that this Court already applied. Is there an insubstantial change that doesn't render the claim meaningless? I think it is very close to the doctrine of equivalence. And I think it is hard to reconcile where does vitiation stop and the doctrine of equivalence begin. I don't disagree with that. And it is a difficult issue. Why isn't it entirely foreseeable that a claim limitation which discusses the depth of the threads could be evaded by reducing the depth of the threads? And therefore, you should have claimed it in a way that didn't leave open that means of evasion. Well, Your Honor, now we're getting into the festo exceptions, the doctrine of equivalence. We're getting into the basis of the doctrine of equivalence is what we are getting into. I don't think you'll find a sound justification for it other than that. But let me address foreseeability, and let me also address why I think there's been an insubstantial change. First of all, for foreseeability, at least in festo, they said it has to be foreseeable in the relevant art at the time of the amendment. So back in 1995, had there been any devices that used this thread undercut system, their 36th witness said they'd never seen it before. In fact, I think everybody agrees it was first created by DePue-Ackerman, another company that we had sued in 2003, eight years after the amendment in question. Their expert said they thought he'd thought he'd seen it in automobile engines. That's where he thought he'd seen it. Again, I would submit that's not the relevant art. I do want to come back to one thing on vitiation, what Mr. Thomas said about how can above can't equal below. It's not as simple as that. He keeps saying there was nothing added. In fact, they added an undercut. That was added. And this court should look to does that thread undercut, which does extend below the top of the rod, is that equivalent to threads that extend below the top of the rod? That is, they didn't just stop the threads above the top of the rod. If they had done that, the device wouldn't work because the set screw would stop there, hit metal, couldn't exert a force on the rod. The device would not function at all. So what they did was they added a second feature, undercut. And that undercut with the threads does extend below the top of the rod. And I suggest- Let me ask you, I just want to make sure I understand. When you refer to the undercut, I'm looking at 4096 and 4097. And I think I look at, I guess maybe it's clearer, on the right-hand drawing in 4096 and 4097. What you refer to the undercut, am I correct in understanding you're talking about the area labeled clearance between rod and bottom of internal thread form? Is that what you're referring to? That, and it actually goes all the way down. So what we've been calling the undercut starts at that top line that says clearance. And all they're showing is that part of the undercut is with that space. It's that white area. And it continues down below the top of the rod. Okay, all right. And it's kind of a chamfer. I just want to make sure I understood. And it's sort of a chamfer. And so, let me go back to my- But that undercut is larger or wider than the undercut from the earlier thread, correct? It certainly is, when you say an undercut in the earlier thread, it certainly is longer than any of the thread roots above it. The width is almost identical. I think it's slightly wider, but it's almost the same as the thread roots above it. On the vitiation, let me provide an example to this court that I think demonstrates why you should look at the entire thread undercut system to say if it goes below rather than to say, hey, above is the opposite of below. In the Moore case, which was cited by this court in a stay order and cited heavily by Medtronic, if I adjust the facts slightly, in that case, of course, this court held that majority can't be the same as minority. The claim required a strip of adhesive to extend the majority of length of a longitudinal strip. The defendant's product only extended 48% of minority. This court said majority can't equal minority. If the facts were adjusted slightly, and if in Moore, the claim said you needed rubber cement to extend the majority of the length of the longitudinal strip, and the defendant used a product where you had rubber cement that went 48% and then white glue that went another 3%, I would suggest they couldn't say, hey, the claim requires rubber cement to go majority. All rubber cement only goes to minority. Majority can't equal minority. We must win. Rather, this court would say, well, hold on a second. You have something else that does extend. You have this white glue, and let's look to see if the rubber cement and white glue is equivalent to just rubber cement. It's the same situation here. They haven't just stopped the threads above the top of the rod. They've added this undercut, and the thread undercut together does extend below the top of the rod. So this court should then decide, if prosecution history estoppel doesn't apply, and we'll get to that in a second, whether that is equivalent. And in fact, there's no issue with that. If there was not what you pointed us to as being the undercut, Mr. Finkelman, if that didn't exist and the threads just stopped, period, I'll say, would you say you'd have a more problem? I think we would have, but that's not the case here. Or a sage problem, say. I think based on those decisions, they would have a much better argument because the threads would have stopped. They'd have nothing there but metal, but the product wouldn't work. That's not what they've done. They've added this undercut. What do you do with the prosecution history? Let's talk about the prosecution history. Doesn't that preclude the application result? It does not, Your Honor, because of course, infesto, there's two exceptions. Well, there's three exceptions, two we believe we need. Certainly the tangentialness exception, which Judge Taylor agreed to. What does that mean? What does tangential mean? Well, the tangentialness exception means does the rationale underlying the amendment bear no more than a tangential relation to the equivalent in question? I think there's two parts to that that are important here that I think get glossed over. If it's fully foreseeable what you're surrendering, how can it be tangential? Well, because you have to look at the reason for the equivalent. Why did we make this equivalent at all? Why did we make it in the process? You're missing my point. If I can fully foresee that this limitation can be avoided with an undercut or with some other mechanical, simple mechanical alteration, how can that be tangential to the purpose of that limitation? Because those are two separate inquiries. Why are they separate inquiries? Well, the Supreme Court made clear that there are two different inquiries. One certainly goes to whether it is foreseeable, as Your Honor is stating. But another one goes to why you're doing the amendment. But how can it logically be unrelated if it's so clearly within the understanding of a claim drafter and one of scientific skill in this art? Now, of course, if you're talking, because all we're talking about is whether prosecution history is thoughtful. In other words, I'm thinking of, I'm one of skill in the art, and I'm recognizing what this limitation encompasses and how it can be avoided and how it can be broadened and limited. Understanding that, how can anything within that grasp of understanding foreseeability be tangential? Well, I would say, Your Honor, first of all, that if that were the rule, then that should apply to the doctrine of equivalence. But that, of course, is not a limitation of the doctrine of equivalence, foreseeability. Well, we haven't addressed that. I understand. We haven't addressed that precisely. But what we do have is, as you say, some kind of a statement about tangentiality. And I'm asking you to tell me, how can something be unrelated if it's so clearly within the knowledge of one of skill in the art? It's so clearly foreseeable. I think they're two completely separate inquiries. Because when you're talking about unrelated, you're dealing now with the patent office and a patent examiner and the back and forth as to why you're doing something with the patent examiner. And even if you can foresee— And who's doing it with the patent examiner? Well, obviously, it's— The drafter. Yes. The one who is foreseeing. And if it's completely within the understanding of that foreseeing person, how can it be tangential? Because even if you can foresee it— Now, of course, when you draft patent claims, you don't have to be able to foresee everything. Foreseeability is not a limitation on the doctrine. So there shouldn't be any difference when you're talking about prosecution history of stop. And so the reason why there can be a difference with tangentialness and foreseeability is you're now—the patent drafter is dealing with the patent examiner. You're trying to address some discrete issue. And you're not thinking about what might happen with the claims down the road or what  You aren't? Well, what you're trying to do— I think that's precisely what you're doing, isn't it? You're trying to draft claims that are going to encompass as broad a scope as possible in order to capture what may come down the road. Isn't that the whole point? Well, certainly, but also what you're trying to do is— You're trying to foresee. Well, what you're trying to do also is address a specific issue that the examiner has raised. And in this case, I just— And you know that if you adjust your language in some way, it's going to have some foreseeable effect. I'm still struggling to discern the distinction between tangential and foreseeability. Well, I think the distinction is that tangentialness, you don't look at what could be happening in the future. What you look at on the task of the Supreme Court is you look at the relationship as to why you've done something in connection with a response from the examiner or connection with— So in other words, if the draftsman can pull the wool over the— if he can foresee it, but maybe keep the examiner from not foreseeing it and state it in such terms that won't be—will somehow raise a tangentialness question, he can foresee it but still get away with it. I don't think that's what's happening here, and I don't agree with that, no. Because what happened here is there was no wool being pulled over the eyes. There was an enablement rejection. I think the record is crystal clear as to why this amendment was made. It was to address an enablement issue. That's the only reason why it was made. And addressing enablement issues can affect the scope of your claim, right? Sure. And you can foresee that effect on the scope of your claim, right? Yes, Your Honor. Well, we're right back where we started. But their test must be different. There are two different tests, and there has to be a distinction. I would suggest the distinction is in tangentialness you look at the relationship as to why you've done something in connection with the examiner. Foreseeability is the second test. And by the way, we don't think this device was foreseeable. This undercut was made in 2003, eight years after we did the amendment. I see I'm out of time. Thank you, Mr. Finkelstein. Mr. Thomas? Yes, Your Honors. With respect to the waiver issue, we disagree with that completely. And it hasn't been raised before in any of the briefings. First time I've heard it. I mean, for us to sit here and say, just as Your Honor pointed out, that we've waived all other defenses to this claim if we want to rule it, we'll move on on that. I think Your Honor picked up on one point that I didn't have a chance to make. Prosecution history is stopping. The record's not crystal clear at all that the only reason for this amendment was to overcome an enablement rejection. Well, there were four rejections, right? Enablement, lack of antecedent basis, prior art, and double patenting. A double patenting, obviousness-type double patenting, which could be obviated with a terminal disclaimer. It was there was a 112 first paragraph, just as you said, second paragraph, and an anticipation rejection over the PUNO 602 patent. There is nothing in the prosecution history that anybody could discern as to how the amendment overcame the PUNO prior art rejection or the 112 first paragraph rejection. But just focusing on the PUNO prior art rejection, if the idea is to look at the intrinsic record to discern why and how an amendment overcame a piece of prior art to allow the applicant to then rebut whether or not there's a full scope of surrender by that narrowing amendment, I would submit that where you can't tell, where the applicant didn't state in the prosecution history why and how he overcame that rejection, he's stuck. Because then what do we look at in order to determine whether it was tangential? We don't know why or how because the applicant didn't say so that particular amendment overcame that prior art rejection. So how do you measure tangentialness when you don't have a starting point? So I would submit the prosecution history estoppel does apply here because the prosecution history does not reflect how or why that amendment could possibly have overcome the 102 prior art rejection. Therefore, that was on them. Well, Mr. Charles, let me ask you though, I'm looking at, and tell me if I'm at the wrong place, I'm looking at 2724 of the, excuse me, of the joint appendix, and that's the PUNO 602. It seems to show, and you can tell me if I'm mistaken on this, it seems to show threads extending beyond the diameter of the screw. And can't we fairly assume that if PUNO was a problem in that regard, this wouldn't have flown, they wouldn't have accepted this limitation? Well, they could have accepted the limitation to overcome the enablement rejection, Your Honor, because still the enablement rejection under 112nd paragraph would still extend, needing to be addressed. The question here is, well, do you think to yourself, well, maybe PUNO didn't have that problem, Your Honor. If an examiner or an applicant makes a mistake in the prosecution. I mean, would they have still flown with what they got if the thread limitation was a problem in PUNO? If the thread limitation, who knows, Your Honor, who knows. But this, again, DOE and this kind of, it's not a do-over statute. If somebody makes a narrowing amendment to a claim during prosecution and it's overly narrow, they didn't have to write it that narrowly to overcome the prior art, they're stuck with it. That's what they should have been looking to. They should have known, or at least tried to, figure out what they had to say to distinguish over a prior art reference. We don't go back under this court's promise. I think we're past our time.